```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Yvette M. McCarroll,             :

      Plaintiff,             :

   v.                            :      Case No. 2:13-cv-1131

                                      :      JUDGE MICHAEL H. WATSON
Commissioner of Social Security,        Magistrate Judge Kemp

      Defendant.             :


                        REPORT AND RECOMMENDATION

                          I.   Introduction

    Plaintiff, Yvette M. McCarroll, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Those applications were filed on May 12, 2010, and alleged that Plaintiff became disabled on October 23, 2008.

    After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on May 21, 2012. In a decision dated July 2, 2012, the ALJ denied benefits. That became the Commissioner's final decision on September 19, 2013, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on February 10, 2014. Plaintiff filed her statement of specific errors on March 12, 2014, to which the Commissioner responded on June 13, 2014. Plaintiff filed a reply on June 23, 2014, and the case is now ready to decide.

    II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 53 years old at the time of the administrative hearing and who has a high school education with

some college, testified as follows.  Her testimony appears at pages 51-86 of the administrative record.

Plaintiff had, in the past, been a licensed medical assistant and a licensed cosmetologist.  She was taking online classes through Columbus State and had done so previously at another university, working toward a Bachelor's degree.  She was having trouble with her math courses and also needed accommodations like extra time to complete tests, audio books, and magnification for paperwork.

The last job Plaintiff held was at Limited Brands.  She checked and steamed returns.  She was sent home frequently either because she was ill or because she fell asleep.  Her last full-time job before that was as a hair stylist.  She also had some managerial duties at the salon at which she worked.

Plaintiff testified that she had been having TIAs since 2006.  They have caused her some memory and concentration problems.  She has blacked out during a TIA.  She also got migraine headaches several times per week, which last between hours and days.  Her migraine medication put her to sleep.  She also had a problem falling asleep on many occasions throughout the day, and she had no control over when it occurred.  Plaintiff also testified to breathing problems and sarcoidosis.  Additionally, she suffered from neck and back pain.  She took Vicodin and muscle relaxants for that condition.  Plaintiff also described vision problems which forced her to use a magnifying glass to read.  Finally, she testified to psychological impairments including PTSD, anxiety, and depression.  Being around people or being under stress brought on anxiety attacks.

On a daily basis, Plaintiff did some household chores, but could work only in spurts or while seated.  She walked with a cane, even in the house.  She had someone else living in her home who did cooking and carried laundry for her.

### III.  The Medical Records

The medical records in this case are found beginning on page 291 of the administrative record. The pertinent records - those relied upon by Plaintiff in support of her statement of errors - can be summarized as follows.

Plaintiff was treated for right-sided facial numbness in 2006. Examination showed evidence of an old stroke. The current problem resulted from either a TIA or an anxiety attack. She was discharged on various medications. At that time, she was still working. She was treated in July and October, 2008 for nausea and weakness, including dizziness, and also for headache, right arm heaviness, and unsteady gait. (Tr. 291-470). Later the same year, she was admitted to the hospital again complaining of slurred speech and confusion, which was attributed to probable TIA. (Tr. 514-22). There are a significant number of treatment records for a right ankle ulceration in early 2009, but these do not appear particularly pertinent to her claim.

Dr. Dadmehr saw Plaintiff in 2009. At that time, she was not reporting any new neurological symptoms. She did say she was more depressed since being laid off. She was being treated for cervical disc disease and fibromyalgia. (Tr. 627). Dr. Dadmehr also reported to Plaintiff's disability insurer that she had been released back to work but her job had been terminated due to her recent illness and hospitalization. The only restriction he placed on her activities was "no climbing." (Tr. 628-29).

Dr. Donaldson, a psychologist, performed a consultative examination on July 14, 2010. At that time, Plaintiff was working part-time, but was having attendance issues. She appeared agitated and her affect was flat. She reported daily crying spells and occasional feelings of worthlessness, as well as constant anxiety. She did say that her weakness had improved. Plaintiff told Dr. Donaldson that she was able to get ready for

work, to cook, to clean, to do laundry, to attend church, to sew, to shop, and to drive. He diagnosed a dysthymic disorder and a generalized anxiety disorder, rated her GAF at 50-55, and concluded that she could understand and carry out simple instructions. She was moderately limited, however, in her ability to relate to supervisors and co-workers and to deal with job stress. (Tr. 676-79). Plaintiff also underwent a physical consultative evaluation, performed by Dr. Ayesi-Offei, who concluded that she could perform light or sedentary work. (Tr. 756-58).

On December 2, 2010, Plaintiff had another follow-up visit with Dr. Dadmehr. Her major complaints at that time were excessive daytime sleepiness and a worsening of her depression. He thought that her acute confusion was secondary to a sleep disorder and he thought she should be tested by a sleep laboratory as soon as possible. He also advised seeing a psychiatrist. (Tr. 785). A prior note described an episode of confusion while Plaintiff was driving; no subsequent episodes occurred. (Tr. 787-88).

Plaintiff followed up on Dr. Dadmehr's recommendation by going to Netcare on December 9, 2010, for an initial assessment. She reported a lengthy history of depression and anxiety, with difficulty focusing and excessive sleepiness. She was not working due to health issues. Plaintiff was diagnosed with depression and PTSD and her GAF was rated at 52. The assessment was signed by Greg Fanning, a licensed social worker. He recommended that Plaintiff follow up with a psychiatrist for counseling and medication. (Tr. 794-802).

The records include a January 17, 2011 letter from Dr. Qadoom, a sleep consultant, which notes that Plaintiff presented with severe daytime fatigue and recurrent somnolence. Her Epworth sleepiness score (which appears to be based on self-

-4-

reporting) was 24, indicating "severe daytime somnolence." Dr. Qadoom scheduled her for a nighttime sleep study. (Tr. 829-31). The study, performed two days later, was negative for obstructive sleep apnea. A further test (a multiple sleep latency test) was recommended and was done the next day. It showed "severe hypersomnia ... consistent with severe pathologic day time sleepiness." Various causes were suggested, including idiopathic hypersomnia, depression, and insufficient sleep syndrome, but narcolepsy could not be ruled out. The recommendations included frequent scheduled daytime naps of 15-20 minutes. (Tr. 834-39). A state agency reviewer, Dr. McCloud, considered this information as well as other records but concluded that it did not affect Plaintiff's ability to do light work. (Tr. 845). A subsequent letter from Dr. Qadoom, dated August 23, 2011, and which Dr. McCloud apparently did not see, reported that Plaintiff still suffered from chronic fatigue and somnolence and that she had been unable to take stimulants to counteract her sleepiness due to a risk of seizures. (Tr. 901). Dr. Dadmehr also reported on August 26, 2011 that she was drowsy and that medication was not helping her. (Tr. 916). Before that, in April, 2011, he had completed a form for the Ohio Rehabilitation Services Commissioner indicating that she could not maintain a work posture (sitting, standing or walking) for eight hours in a work day, which he based on diagnoses of major depression, PTSD, idiopathic hypersomnia, ataxia, glaucoma, strokes, and migraines. (Tr. 1006-09). Other treatment notes during 2011 also make frequent reference to Plaintiff's idiopathic hypersomnia. Problems staying awake are also noted in some records from a community rehabilitation low vision and evaluation done in 2011. Other home care notes from 2011 indicate considerable issues with balance and confusion as well as lethargy.

Dr. Tilley completed an evaluation for the Ohio Department

of Job and Family Services after reviewing documents and conducting an interview with Plaintiff. Plaintiff was somatically preoccupied during the interview. Her thought processes were "tangential, but not grossly disorganized." She did not show any evidence of memory problems. He diagnosed PTSD, panic disorder, mood disorder, and somatoform disorder, and rated her GAF at 50. His conclusion was that she was unemployable, and he indicated she had moderate impairments in twelve different areas of work-related functioning, including maintaining attention and concentration, staying on schedule, and completing a work day or work week without interruption from psychologically-based symptoms. (Tr. 840-41). She was subsequently hospitalized for seven days in September, 2011, for suicidal thoughts. Again, treatment by a psychiatrist was recommended. (Tr. 878-88).      Plaintiff began seeing a counselor, Joseph Hambor, at River Valley Counseling on October 4, 2011. His notes from that date through the end of the year are largely unreadable but do show some evidence of continued depression as well as sleepiness. (Tr. 890-99). She also was seen by Dr. Saribalas during that time frame. During his November 17, 2011 clinical interview, Plaintiff exhibited a depressed mood, cried frequently, had a flat affect, rambled, and was circumstantial. He thought her GAF at that time was 35. He changed her medications and continued to see her. By February 1, 2012, he had revised her GAF to 30. She had also shown "just a hint of improvement ... in regard to her daytime sleepiness." He also completed a form indicating marked or extreme limitations in almost every category of work-related functioning and said that she could not cope with even basic stressors due to her illness. (Tr. 909-13). Mr. Hambor filled out a similar form on February 15, 2012 indicating even more extreme limitations. He noted, among other things, that stress in her personal relationship had

resulted in her hospitalization for suicidal ideation. (Tr. 1097-99).

### IV. The Vocational Testimony

Carl Hartung was the vocational expert in this case. His testimony begins on page 86 of the administrative record.

Mr. Hartung testified that Plaintiff's position as a store laborer was unskilled and medium. The hair stylist position was skilled and light, and the managerial responsibilities fell in the semi-skilled range.

Mr. Hartung was then asked some questions about a hypothetical person who had Plaintiff's educational and work history and who could work at the light exertional level. That person could do the hair stylist job or the managerial job. If, the person could complete only tasks where production quotas were not critical in an object-focused work setting, and could adapt to changes in the work setting, that person could still work as a hair stylist, and could also work as a cashier, rental counter clerk, or fast food worker.

Mr. Hartung was then asked if someone who would need an assistive device could do any of those jobs. He did not think so, but he did testify that such a person could do some light office jobs which were primarily sedentary. However, frequent napping would not be allowed in the workplace, and a person who was off task from 26% to 50% of the day also could not work. The same would be true for someone who could not sit, stand, and walk for a total of eight hours in a workday.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19-35 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status of the Social Security Act through

December 31, 2014.  Second, the ALJ found that Plaintiff had engaged in substantial gainful activity after her alleged onset date, and deferred a finding on when she last worked.  Next, the ALJ determined that Plaintiff had severe impairments including degenerative disc disease, diabetes, a history of congestive heart failure, lupus, fibromyalgia, chronic fatigue syndrome, pulmonary sarcoidosis, osteoarthritis, history of transient ischemic attacks, depression, and post-traumatic stress disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

     Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level except that she was able to sustain attention to complete tasks where production quotas were not critical, in an object-focused work setting, and was able to adapt to routine changes in a static work setting.  The ALJ found that, with these restrictions, Plaintiff could perform her past relevant work as a hair stylist, and could also do the other light jobs identified by Mr. Hartung.  The ALJ also concluded that those jobs existed in significant numbers in the local and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

               VI.   <u>Plaintiff's Statement of Specific Errors</u>

    In her statement of specific errors, Plaintiff raises these issues; (1) the ALJ did not properly consider all the relevant evidence or properly weigh the opinion evidence in developing his residual functional capacity finding; (2) the ALJ did not consider the impact of Plaintiff's hypersomnia in determining her functional capacity; and (3) the ALJ failed to follow the sequential evaluation process by deferring a finding on substantial gainful activity at step one.  The Court analyzes

these claims under the following standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A.  <u>Hypersomnia</u>

The Court addresses Plaintiff's second statement of error first.  Plaintiff contends that her hypersomnia should have been deemed a severe impairment.  The Court agrees.

Under social security law, a severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.  20 C.F.R. §404.1520(c).  Basic work activities relate to the

abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). The question of severity is not related to the plaintiff's age, education, or work experience. A nonsevere impairment is one which would not be expected to interfere with a Plaintiff's ability to work regardless of "whether the claimant was sixty-years old or only twenty-five, whether the claimant had a sixth grade education or a master's degree, whether the claimant was a brain surgeon, a factory worker, or a secretary." Salmi v. Secretary of H.H.S., 774 F.2d 685, 691-92 (6th Cir. 1985). An impairment will be considered nonsevere only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." Farris v. Secretary of H.H.S., 773 F.2d 85, 90 (6th Cir. 1985), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). The Commissioner's decision on this issue must be supported by substantial evidence. Mowery v. Heckler, 771 F.2d 966 (6th Cir. 1985).

As noted in the summary of the medical evidence, beginning in December, 2010, the records are replete with reference to idiopathic hypersomnia. Dr. Dadmehr's notes make mention of the condition, and Dr. Qadoom tested for and diagnosed it. Many treatment and other notes throughout 2011 refer both to the condition and the effect it was having on the Plaintiff.

The ALJ's discussion of this disorder is far too sparse to allow the Court to find it supported by substantial evidence. In the portion of the administrative decision in which he discusses severe impairments, the ALJ says only this: "The records show she had symptoms of somnolence [and several other impairments].... I find that these impairments are not 'severe' impairments ...

-10-

because there is no evidence that these conditions have more than minimal limitation on the claimant's ability to perform work-related activities." (Tr. 22). The only other discussion of hypersomnia appears at Tr. 27: "the claimant reported to Dr. Dadmehr of excessive daytime sleepiness, but no recent syncope and worsening depression. (Exhibit 30F, p. 1). The claimant was sent for sleep testing which did not show evidence of a diagnosis of any sleep disorder (see Exhibits 34F and 36F)." But these statements are inaccurate; the record contains numerous opinions that Plaintiff's hypersomnia affected her ability to maintain attention for an entire work day, and the testing done by Dr. Qadoom, while it did not demonstrate sleep apnea, showed severe hypersomnia. By failing to mention or even acknowledge the existence of this evidence, or to provide reasons why it does not support a finding that Plaintiff's hypersomnia was a severe impairment, the ALJ committed clear error. See, e.g., Brown v. Comm'r of Social Security, 2008 WL 828854, *3(W.D. .Mich. March 26, 2008)("Absent an assessment of the testimony and medical records by the ALJ, this Court cannot properly review the ALJ's determinations").

  The Commissioner argues, however, that any error at step two of the analysis was harmless. The Commissioner appears to contend that any time an ALJ proceeds beyond step two, the failure to find that a specific impairment is severe is "clearly inconsequential." Commissioner's Memorandum, Doc. 19, at 7. However, the actual decisional rule is more limited; a step two error is harmless only if "the ALJ consider[s] all of [the claimant's] impairments in [the] residual functional capacity assessment finding ...." Pompa v. Comm'r of Social Security, 73 Fed. Appx. 801, *1 (6th Cir. Aug. 11, 2003); see also Taylor v. Astrue, 2012 WL 870770, *5 (S.D. Ohio March 14, 2012)(if the ALJ makes an error at step two, "the question becomes whether the effect of these [nonsevere] conditions was properly taken into

-11-

account at step four of the process when the ALJ determined plaintiff's ... residual functional capacity"), <u>adopted and affirmed</u> 2012 WL 1268178 (S.D. Ohio April 13, 2012).

Here, the ALJ clearly did not consider Plaintiff's hypersomnia when determining her residual functional capacity. Rather, the ALJ apparently concluded, based on his misinterpretation of the test results and his disregard of the opinions of those physicians who diagnosed and discussed Plaintiff's idiopathic hypersomnia, that it had no effect on her functional capacity.  Under these circumstances, the error is not harmless, and a remand is necessary to allow the ALJ to consider all of the evidence and to make proper findings.

B.  <u>Step One Issue</u>

Plaintiff also raises an issue about the ALJ's decision to defer the decision about whether Plaintiff engaged in substantial gainful activity after her alleged onset date.  The Commissioner argues that this was also harmless because the ALJ did continue the sequential evaluation process, and the "no disability" finding meant that the ALJ never had to determine if Plaintiff continued to work after her onset date.

The Court finds it odd that the ALJ would defer a decision on this issue, but cannot locate any case where that procedure was considered reversible error when the ALJ nonetheless continued with the sequential evaluation process.  Because this case should be remanded for further evaluation of the evidence relating to Plaintiff's hypersomnia, the ALJ will have another opportunity to address the step one inquiry, which will be relevant should the ALJ determine both that Plaintiff is disabled and that her onset date was prior to the last date she actually worked.

C.  <u>Residual Functional Capacity</u>

The other issue which Plaintiff raises is whether the ALJ properly determined her residual functional capacity.  Much of

that argument centers around the ALJ's treatment of the opinion evidence, especially the opinions of the treating sources and of her counselor, Mr. Hambor. To some extent, the ALJ's failure properly to recognize and analyze the issue of Plaintiff's hypersomnia influenced his discounting of the opinions of several of the treating sources, and it would serve no particular purpose to engage in an extensive review of the ALJ's decision on these matters until he has had a chance to factor that impairment and its effects into his residual functional capacity finding. The Court makes these observations, however, which may be helpful on remand.

Although Plaintiff reported excessive drowsiness, even to the point of being sent home from work when she was employed through the temporary service, the medical notes do not mention this condition until December, 2010. No diagnosis was made until January, 2011. Up until those dates, the ALJ may have had reasonable grounds for discounting, at least to some extent, the treating source opinions to the extent they took Plaintiff's drowsiness into account. However, once that diagnosis was established, the ALJ should have properly factored it into his analysis.

Additionally, there are obvious errors in the ALJ's discussion of some of the opinion evidence. For example, the ALJ concluded that Dr. Tilley thought Plaintiff could not work due to narcolepsy. In fact, his report says only that Plaintiff cited narcolepsy as the reason for leaving her last job; his opinion was clearly based on the psychological disorders he diagnosed and his view of their severity. Moreover, although the ALJ rejected Dr. Tilley's opinion of unemployability as inconsistent with the form he completed, the ALJ did not ask the vocational expert if someone with the large number of moderate impairments which Dr. Tilley attributed to Plaintiff could still work.

The analysis of the treating source opinions is also

superficial.  As Plaintiff points out, Dr. Saribalas did attach treatment notes to his opinion, although the ALJ seemed to discount the extent of the treating relationship.  The vague reference to inconsistencies between Dr. Saribalas' opinion and "the other evidence of record" comes close to being an inadequate statement of reasons for rejecting his opinion; it is not clear what other evidence concerning Plaintiff's various psychological disorders is inconsistent with his opinion except for the consultative examination of Dr. Donaldson, which was done almost a year-and-a-half before, and prior to the time when Plaintiff stopped working and reported more depression and hypersomnia. Additionally, both Dr. Donaldson and Dr. Saribalas (as well as Dr. Tilley) noted an impairment in the ability to relate to others, but the ALJ did not make a finding on that issue nor explain why all of those views were rejected; even Dr. Marlow, the state agency reviewer, expressed concern about Plaintiff's having "frequent contact with the public," but that did not make its way into the ALJ's residual functional capacity finding nor the hypothetical question posed to Mr. Hartung, even though the ALJ purportedly gave great weight both to Dr. Donaldson's and Dr. Marlow's opinions.  All of these matters should also be addressed on remand.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).

A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp  
United States Magistrate Judge